EL PUEBLO DE PUERTO RICO, demandante y peticionario, *v.* JOSÉ LUIS DELGADO RODRÍGUEZ, acusado y recurrido.

*Número:* O-78-100          *Resuelto:* 27 de diciembre de 1978

*Héctor A. Colón Cruz, Procurador General, Maggie Correa Avilés, Procuradora General Auxiliar,* abogados del peticionario; *Benigno Alicea Alicea,* abogado del recurrido.

### SENTENCIA

Se confirma la resolución recurrida por estar el Tribunal igualmente dividido. El Juez Presidente, Señor Trías Monge, emitió una opinión, a la cual se unieron los Jueces Asociados Señores Dávila, Torres Rigual e Irizarry Yunqué. El Juez Asociado, Señor Díaz Cruz, emitió opinión separada, a la cual se unieron los Jueces Asociados Señores Rigau, Martín y Negrón García.

Lo acordó y manda el Tribunal y certifica el señor Secretario.

(*Fdo.*) Ernesto L. Chiesa

*Secretario General*

—O—

Opinión emitida por el Juez Presidente, Señor Trías Monge, a la cual se unen los Jueces Asociados Señores Dávila, Torres Rigual e Irizarry Yunqué.

San Juan, Puerto Rico, a 27 de diciembre de 1978

La cuestión a determinar en este caso es si la norma en *Pueblo* v. *Meléndez Cartagena,* 106 D.P.R. 338 (1977), debe

tener únicamente efecto prospectivo. En *Meléndez Cartagena* resolvimos que en las circunstancias allí presentes no era permisible imponer condenas separadas por los delitos de poseer, transportar y transferir heroína. Anulamos las sentencias por los primeros dos delitos y mantuvimos en vigor la tercera.

El recurrido en el caso de autos, J. L. Delgado Rodríguez, invoca los beneficios del referido fallo. En 1971 se acusó al recurrido de infringir el Art. 29(2) de la Ley de Narcóticos de Puerto Rico, Ley Núm. 48 de 18 de junio de 1959, 24 L.P.R.A. sec. 974z(2). Se le imputó haber poseído, ocultado, transportado y transferido heroína. Fue declarado culpable y sentenciado a cumplir de ocho a doce años de reclusión por cada cargo. El tribunal dispuso que las sentencias por los delitos de transportación, ocultación y traspaso se cumpliesen consecutivamente, mas concurrentemente con la condena por posesión de la droga. Este Tribunal confirmó el fallo el 4 de abril de 1972.

En octubre de 1977 el recurrido radicó ante el Tribunal Superior una Moción de Anulación de Sentencia fundada en la norma de *Meléndez Cartagena*. El tribunal de instancia la declaró con lugar y anuló las condenas por los delitos de posesión y transportación, manteniendo en vigor la sentencia en el caso de traspasar y recibir heroína. El Procurador General ha comparecido ante nos para solicitar que no se aplique retroactivamente la regla de *Meléndez Cartagena*.

El debido análisis de la cuestión planteada exige que examinemos la fuente y razón de la doctrina de la irretroactividad o aplicación prospectiva de los fallos, los criterios elaborados para regir su uso, las críticas formuladas a estos criterios y el impacto sobre el caso presente de las conclusiones derivables de todo lo anterior.

1. *Trasfondo de la doctrina de la irretroactividad.*

La doctrina de la irretroactividad de algunos fallos judiciales es de cuño relativamente reciente. Se le desconocía en

el derecho común.(¹) Todavía los tribunales ingleses se abstienen de utilizarla, aunque algunos comentaristas la favorecen en determinadas circunstancias. Lord Diplock, *The Courts as Legislators*, Presidential Address, The Holdsworth Club, 1965; Friedmann, *Limits of Judicial Lawmaking and Prospective Overruling*, 29 Modern L. Rev. 593 (1966). La situación canadiense es análoga. Friedland, *Prospective and Retrospective Judicial Lawmaking*, 24 U. of Toronto L.J. 171 (1974). La Cámara de los Lores estimaba hasta hace poco que carecía aún de poder para revocar sus propias decisiones, facultad que a su juicio residía exclusivamente en el Parlamento. *Attorney General* v. *Windsor*, 11 Eng. Rep. 472 (1860). Aun luego de concluir lo contrario, *House of Lords Practice Statement* [1966] 3 All E.R. 77, existe gran resistencia a emplear el nuevo poder. Stone, *On the Liberation of Appellate Judges: How Not to Do It!*, 35 Modern L. Rev. 449, 462–463 (1972).

La técnica de la aplicación prospectiva de los fallos se desarrolla principalmente en Estados Unidos. No deriva de estatuto alguno o disposición expresa de la Constitución. Fue una invención judicial.(²) Hay casos norteamericanos aislados que se remontan a 1892 en que se emplea tal método, pero no es hasta *Linkletter* v. *Walker*, 381 U.S. 618 (1965), que se crea y bautiza la doctrina oficialmente. Es de ahí que emigra a Puerto Rico. Este Tribunal adoptó las pautas sen-

---

(¹) Se desconoce también en derecho civil español, donde continúa el debate, aun luego de la aprobación del nuevo Título Preliminar del Código Civil, sobre si la jurisprudencia constituye o no fuente del derecho. *Comentarios a las Reformas del Código Civil*, Ed. Tecnos, Madrid, 1977, vol. 1, pág. 132 y ss.

(²) El Tribunal Supremo de los Estados Unidos creó distintos tipos de irretroactividad. Existen la irretroactividad pura, en que la nueva regla se aplica únicamente a los casos futuros y ni siquiera al caso en que se anuncia; aquella que le da efecto prospectivo a la norma a partir de la fecha de la sentencia, aplicándose la nueva regla al caso en que se anuncia y a los que surjan a partir de tal fecha; aquella que aplica la nueva norma a todos los casos pendientes, y aquellas que fijan otra fecha, al arbitrio del Tribunal.

tadas en *Linkletter* en *Rivera Escuté* v. *Jefe Penitenciaría*, 92 D.P.R. 765 (1965).

La doctrina de la irretroactividad, tanto en la versión original expuesta en *Linkletter* como en sus giros posteriores, ha sido objeto de intenso debate. Mishkin, *The Supreme Court 1964 Term, Foreword: The High Court, The Great Writ and the Due Process of Time and Law*, 79 Harv. L. Rev. 56 (1965); Schwartz, *Retroactivity, Reliability and Due Process: A Reply to Professor Mishkin*, 33 U. of Chi. L. Rev. 719 (1966); Haddad, *Retroactivity Should be Rethought: A Call for the End of the Linkletter Doctrine*, 60 J. Crim. L.C. & P.S. 417 (1969); Mallmud, *Prospective Limitation and the Rights of the Accused*, 56 Iowa L. Rev. 321 (1970); Rossum, *New Rights and Old Wrongs: the Supreme Court and the Problems of Retroactivity*, 23 Emory L.J. 381 (1974); Beytagh, *Ten Years of Non-Retroactivity: A Critique and a Proposal*, 61 Va. L. Rev. 1557 (1975). La crítica ha sido generalmente desfavorable al modo en que el Tribunal Supremo de Estados Unidos ha aplicado la nueva teoría. Algunos autores aun han argumentado que la irretroactividad debe abolirse. Hasler, *Retroactivity Rethought: The Hidden Costs*, 24 Maine L. Rev. 1, 34 (1972). La generalidad considera que la doctrina de la irretroactividad puede servir propósitos útiles en varias situaciones específicas, pero que deben reexaminarse los criterios tradicionalmente empleados para regir su uso. El propio Tribunal Supremo de Estados Unidos ha comenzado a cuestionar la aplicabilidad de los viejos criterios en determinadas instancias. *Robinson* v. *Neil*, 409 U.S. 505 (1973).

Antes de *Linkletter* la posición tradicional era que los fallos judiciales difieren de los estatutos precisamente en que los segundos tienen efecto prospectivo y los primeros no. La aplicación retroactiva de las sentencias se explicaba lamentablemente, sin embargo, en términos de la vetusta teoría de que lo único que los jueces hacen o deben hacer es descubrir la

ley que siempre ha existido. Desde Blackstone hasta nuestros días, en que todavía sobreviven autores que suscriben el concepto, se le negaba a la judicatura papel alguno en el proceso de formación de la ley. Un fallo judicial no podía tener efecto prospectivo porque ello equivalía a legislar. El mito que justificó históricamente la norma de la retroactividad no goza hoy de gran favor. Se sabe que imperativos de justicia y trato igual ante la ley, entre otros valores, bastan para brindarle sólido fundamento a esta norma. Se sabe también que estos mismos valores pueden exigir en ciertos casos que un fallo reciba únicamente efecto prospectivo. El problema estriba en evitar el empleo indiscriminado de la irretroactividad, la estructuración de normas excesivamente amplias o inflexibles. La técnica de la irretroactividad o limitación prospectiva de los fallos ha desarrollado también desafortunadamente su propia mitología. Traynor, *Quo Vadis, Prospective Overruling: A Question of Judicial Responsibility*, 28 Hastings L.J. 533 (1977); Freeman, *Standards of Adjudication, Judicial Law-Making and Prospective Overruling*, 26 Current Legal Problems 166 (1973).

Para completar el trasfondo de la teoría de la irretroactividad debe recordarse igualmente que ella fue esencialmente un producto de la corte presidida por el Juez Warren. Fuera de sus méritos intrínsecos, la doctrina sirvió entonces fines eminentemente prácticos. Aquéllos eran tiempos de vastas reformas, especialmente en el campo del enjuiciamiento criminal. La introducción del novel recurso de imprimirle efecto prospectivo a algunas decisiones innovadoras necesariamente facilitó su adopción por el Tribunal y redujo su impacto sobre los sistemas estatales de impartir justicia. Al mismo tiempo, la utilización frecuente de la nueva técnica dramatizó inevitablemente el rol "legislativo" de la Corte y envolvió a ésta en agrias disputas sobre su alegado activismo y la base filosófica de sus actuaciones. Levy, *Realist Jurisprudence and Prospective Overruling*, 109 U. of Pa. 1 (1960).

Examinemos a continuación, conscientes de las circunstancias particulares que provocan la gestación de la técnica de la irretroactividad, los criterios desarrollados para su uso por el Tribunal Supremo de los Estados Unidos.

2. *Los criterios tradicionales para el empleo de la doctrina.*

La formulación y desarrollo de los criterios tradicionales ocurren principalmente en *Linkletter* v. *Walker*, supra; *Tehan* v. *United States ex rel. Shott*, 382 U.S. 406 (1966); *Johnson* v. *New Jersey*, 384 U.S. 719 (1966); *Stovall* v. *Denno*, 388 U.S. 293 (1967); *Desist* v. *United States*, 394 U.S. 244 (1969); *Halliday* v. *United States*, 394 U.S. 831 (1969); *United States* v. *U.S. Coin and Currency*, 401 U.S. 715 (1971); *Furman* v. *Georgia*, 408 U.S. 238 (1972); *Hankerson* v. *North Carolina*, 432 U.S. 233 (1977) y *Robinson* v. *Neil*, supra. En estos casos y en los artículos de revista antes citados se mencionan otros de importancia. En *Stovall* se enumeran los tres criterios básicos que comenzaron a plasmarse en *Linkletter* para determinar si una decisión debe tener únicamente efecto prospectivo.

Debe tomarse en consideración, expuso el Tribunal, el propósito que persigue la norma recién establecida en el caso objeto de análisis. De imprimírsele efecto retroactivo a la norma, ¿se cumple mejor su propósito? El segundo criterio atañe al grado en que la confianza generada por la antigua regla requiere que sólo tenga efecto prospectivo la norma que la sustituya. El tercer criterio consiste en medir el impacto en la administración de la justicia de la aplicación retroactiva de la nueva norma.

El Tribunal Supremo de Estados Unidos ha establecido jerarquías entre estos criterios. En *Desist*, supra, 249, se resolvió que el primordial es el primero mencionado aquí. En *Halliday* se determinó que los criterios enumerados controlan la retroactividad o irretroactividad tanto de decisiones de asuntos constitucionales como de otra índole. En *Williams* v.

*United States*, 401 U.S. 646 (1971), se le negó validez a distinción alguna entre los métodos de revisión directa y de ataque colateral como medio para plantear el efecto retroactivo de una regla.

La aplicación y aun la propia creación de estos criterios no fue tarea generadora de gran armonía en el Tribunal Supremo de Estados Unidos. El Juez Harlan señaló en una ocasión que el peregrinaje de *Linkletter* es casi tan difícil de seguir "como las huellas de un animal feroz en búsqueda de su víctima escogida." *Mackey* v. *United States*, 401 U.S. 667, 676 (1971). Para el Juez Fortas, cuando se trata de aplicar un principio constitucional de orden sustantivo la retroactividad debe negarse únicamente bajo las circunstancias más apremiantes. *Desist*, supra, 273.

3. *La crítica a los criterios tradicionales.*

En *United States* v. *U.S. Coin and Currency*, supra, 724, se perciben los primeros indicios de inconformidad de la Corte con su propia expresión de la nueva doctrina. El Tribunal había llegado a afirmar en *Linkletter*, 639, que tan solo las normas procedimentales que afecten la integridad del proceso de determinar los hechos deben recibir efecto retroactivo. En *U.S. Coin* el Tribunal se apartó de esta pauta por estimar que "la conducta que [aquí] se penaliza es constitucionalmente inmune al castigo. Ninguna otra circunstancia requiere con más fuerza la invocación de la más completa retroactividad." Asimismo en *Furman* v. *Georgia*, supra, se hizo caso omiso de la referida doctrina de *Linkletter* y se aplicó retroactivamente la norma allí envuelta, aun cuando la integridad del proceso de determinar los hechos no quedaba afectada. Por último, en *Robinson* v. *Neil*, supra, se resuelve que la fórmula de *Linkletter* y casos posteriores no es aplicable a todo tipo de caso. *Linkletter* y su progenie, se expresa, tratan de problemas relativos al uso de determinada prueba o a modos específicos de enjuiciar a un acusado. Su enfoque no es apropiado en controversias que envuelven algunas garantías no procesales.

Basado en este razonamiento, el Tribunal le impartió efecto retroactivo a la norma anunciada en *Waller* v. *Florida*, 397 U.S. 387 (1970), sobre el alcance de la cláusula de la Quinta Enmienda relativa a la exposición anterior.

Otras cortes federales y estatales han ido desarrollando el enfoque de *Robinson*. En *Bailey* v. *Holley*, 530 F.2d 169 (7th Cir. 1976), se reitera que debe ser retroactiva toda decisión en que la conducta penalizada es constitucionalmente inmune a castigo, añadiéndose que las mismas normas que gobiernan el efecto prospectivo o retroactivo de una decisión de orden constitucional rigen también los fallos interpretativos de un estatuto. En *Adkins* v. *Leverette*, 239 S.E.2d 496 (W. Va. 1977), se le impartió plena retroactividad a una decisión en que se resolvía que el tiempo transcurrido en libertad bajo palabra antes de la revocación de esta debe aplicarse a la sentencia a cumplirse. Resolvió el Tribunal que la confianza depositada por el Estado en la norma contraria, establecida en decisiones anteriores, era irrelevante ya que la cláusula protectora de la doble exposición impide no sólo la celebración de un segundo juicio, sino la imposición de un segundo castigo.

Los comentaristas, según habíamos adelantado, han ido igualmente más lejos en la crítica del análisis de *Linkletter* y casos posteriores. Para Traynor, la técnica del efecto prospectivo debe utilizarse únicamente en aquellos casos contados en que los fines de la justicia y del respeto a la ley exijan con toda claridad su empleo. A su juicio, el problema básico es el logro de la justicia, la determinación en diferentes clases de casos de si ese propósito se cumple mejor a través de la retroactividad o de la aplicación prospectiva. La confianza depositada en la norma es generalmente irrelevante en casos de índole penal. Los otros dos criterios son también inadecuados. "Su insuficiencia," explica el distinguido comentarista, "radica principalmente en no medir el sufrimiento y la inequidad que padecen aquellos a quienes se les niega el beneficio de la nueva norma y quedan obligados a soportar el peso de lo que

se reconoce ya como una regla injusta. Tal sufrimiento, especialmente cuando median los peligros de prisión y ajusticiamiento, parecería pesar más que la confianza depositada en la vieja norma por las agencias encargadas de ejecutar la ley, así como el peso adicional que se imponga en la administración de la justicia." Traynor, *Quo Vadis, Prospective Overruling: A Question of Judicial Responsibility*, 28 Hastings L.J. 533, 561 (1977). Según Traynor, la negativa a liberar a un prisionero por razón de una fecha arbitraria suscita un grave problema de igual protección de las leyes. *Ibid.*, 559.

Rossum considera que los criterios de *Linkletter* pueden ser de utilidad, pero no necesariamente en el contexto o hasta el grado en que tradicionalmente se emplean. Rossum no descarta enteramente, por ejemplo, el factor de la confianza depositada en la norma, pero favorece que se haga siempre la pregunta de cuál es el daño que fluiría de su rechazo en un caso específico. "Los jueces y los ejecutores de la ley," señala el autor, "pueden sentirse frustrados o molestos, pero ciertamente no perjudicados o castigados por la confianza indebidamente depositada." Rossum, *New Rights and Old Wrongs: The Supreme Court and the Problem of Retroactivity*, 23 Emory L.J. 381, 398–399 (1974). Rossum recalca la necesidad de tomar especialmente en cuenta, en adición a los criterios tradicionales sujetos a nuevo análisis, los criterios de la libertad, la igualdad y la imagen de la justicia. *Ibid.*, 403. Veamos las conclusiones derivables de todo lo anterior y su impacto sobre el caso presente.

### 4. *Conclusiones.*

La técnica de la irretroactividad representa a nuestro entender un recurso de valor para el desarrollo prudente del derecho y la tarea de impartir justicia. Ha sufrido excesos. No es aplicable a todo género de controversia. Pueden refinarse los criterios establecidos para su uso. Deben incluirse otros valores. No han recibido en ocasiones su debido peso los valores de la justicia y la igualdad ante la ley. A fin de cuen-

tas, de lo que se trata es de sopesar intereses, situación a situación, se opte o no en algunas instancias por requerir la presencia de intereses apremiantes como condición para negarle, total o parcialmente, retroactividad a un fallo.

Las circunstancias del caso presente nos relevan de adentrarnos más en el tema de la insuficiencia de los criterios de *Linkletter*. Al igual que en *Robinson*, no se trata aquí de una garantía que involucre el proceso de determinar los hechos. (3) Se trata de un derecho al que se le ha asignado rango constitucional por muchos tribunales, aun bajo constituciones más parecidas a la de Estados Unidos que la nuestra. *State* v. *Ahuna*, 474 P.2d 704 (Haw. 1970); *Heldenbrand* v. *Mills*, 476 P.2d 375 (Okla. 1970); *People* v. *Stewart*, 256 N.W.2d 31 (Mich. 1977); *People* v. *Martin*, 247 N.W.2d 303 (Mich. 1976); *State* v. *Allen*, 292 A.2d 167 (Me. 1972); *Newton* v. *State*, 373 A.2d 262 (Md. 1977); *Adkins* v. *Leverette*, 239 S.E.2d 496 (W. Va. 1977). La Sec. 11 del Art. II de la Constitución del Estado Libre Asociado provee que "Nadie será puesto en riesgo de ser castigado dos veces por el mismo delito." (4) Se advertirá que esta fraseología impide tanto múltiples procesamientos como múltiples penas por el mismo delito. Sea por obra de nuestra Constitución o del estatuto correspondiente, (5) además, la conducta castigada aquí estaba inmune

(3) De este género de garantía es que hemos hablado hasta ahora en otros casos. *Rivera Escuté* v. *Jefe Penitenciaría*, supra; *Pueblo* v. *Adorno Lorenzana*, 93 D.P.R. 788 (1966); *Pueblo* v. *Guadalupe Rosa*, 94 D.P.R. 190 (1967); *Pueblo* v. *Natal Rojas*, 93 D.P.R. 844 (1967); *Pueblo* v. *Vélez Santiago*, 95 D.P.R. 619 (1967); *Pueblo* v. *Delgado Martínez*, 96 D.P.R. 720 (1968); *Pueblo* v. *Cruz Jiménez*, 99 D.P.R. 565 (1971); *Pueblo* v. *Martínez Rivera*, 99 D.P.R. 568 (1971); *Pueblo* v. *Candelario Couvertier*, 100 D.P.R. 159 (1971) y *Pueblo* v. *Báez Cintrón*, 102 D.P.R. 30 (1974). Es interesante señalar que en la opinión disidente de los Jueces Santana Becerra, Hernández Matos y Dávila en *Pueblo* v. *Delgado Martínez*, supra, se anticipan aspectos básicos de *Robinson*.

(4) La Constitución federal, Enmienda Quinta, dispone al respecto: ". . . nadie podrá ser sometido por el mismo delito dos veces a un juicio que pueda ocasionarle la pérdida de la vida o la integridad corporal . . . ."

(5) El Art. 44 del Código Penal de 1937, 33 L.P.R.A. sec. 90, vigente al momento de los hechos de este caso, disponía: "Un acto u omisión penable

a castigo por ser parte de un mismo acto dentro del criterio expresado en *Meléndez Cartagena,* cuestión no impugnada por el Ministerio Público. El tribunal de instancia carecía simplemente de poder para imponer múltiples castigos por la misma ofensa.

Estamos ante una situación muy particular, radicalmente distinta a la de *Linkletter.* El resultado de *Meléndez Cartagena* privó a los tribunales del país de autoridad para imponer las sentencias impugnadas. ¿Cómo decretar entonces que se cumplan penas por algunos, pero por otros no, cuando su imposición está prohibida, necesariamente para todo tiempo, por nuestro ordenamiento jurídico? La extensión de la doctrina de la irretroactividad a este singular género de casos, al menos en ausencia de intereses apremiantes del Estado que así lo exijan, ofende el principio de igualdad ante la ley y, en palabras del Juez Fortas en *Desist,* disminuye la Constitución.

El caso de autos es de índole tan particular, no obstante, que aun bajo los combatidos criterios de *Linkletter,* y su progenie se alcanza el mismo resultado. El criterio más importante, como se ha indicado, es el propósito de la nueva norma y la manera de servirlo mejor. Cuando el objetivo, como ocurrió en el propio *Linkletter,* es establecer una regla encaminada a disuadir a los agentes del orden público de emplear ciertas tácticas indeseables, la declaración de retroactividad de la norma no sirve tal fin. Basta en dicho caso con impartirle efecto prospectivo a la norma. El propósito de *Meléndez Cartagena,* parecido al de *Robinson,* es otro. En *Meléndez Cartagena* se declara que hay ausencia de poder para imponer más de una sentencia por los delitos que allí se imputaron. El mejor método de servir este objetivo es reconociendo que

---

de distintos modos por distintas disposiciones de este Código, podrá castigarse con arreglo a cualquiera de dichas disposiciones, pero en ningún caso bajo más de una . . . ." El Art. 63 del nuevo Código Penal, 33 L.P.R.A. sec. 3321, repite esencialmente este lenguaje.

así como no existe autoridad hoy tampoco la hubo ni la podía haber antes. La posición contraria derrota el propósito de la norma. Estamos ante una instancia clásica para la aplicación de la norma de retroactividad.

Los otros dos criterios carecen del rango del anterior, pero aún así su análisis no revela en este caso la presencia de intereses superiores al de no penalizar conducta constitucionalmente inmune a castigo. No es este un caso en que los funcionarios a cargo de ejecutar la ley son los que principalmente depositan confianza en la norma. La confianza se depositó aquí por la judicatura y es la judicatura quien ha retirado esa confianza. *Meléndez Cartagena* no afecta en lo más mínimo la investigación por la Policía o el curso de acción del Ministerio Público en estos casos. Puede continuarse acusando por las diferentes violaciones imputadas en *Meléndez Cartagena*. Pueden obtenerse convicciones por los distintos cargos. Lo único que impide *Meléndez Cartagena* es la imposición de múltiples penas cuando las ofensas imputadas son el producto de un mismo acto o curso de acción. Debe advertirse también que el resultado de *Meléndez Cartagena* se previó por este Tribunal, en otro contexto, en *González* v. *Tribunal Superior*, 100 D.P.R. 136 (1971). El criterio de la confianza depositada en la norma no posee aquí la fortaleza para inclinar la balanza al lado contrario del favorecido tan pesadamente por el primer criterio.

Respecto al último factor, el impacto sobre la administración de la justicia, las situaciones a que se refiere este criterio normalmente son aquellas en que, al igual que en *Linkletter*, de reconocérsele efecto retroactivo a la norma se le estaría exigiendo al Estado la tarea prácticamente imposible de celebrar nuevos juicios muchos años después de los hechos, con la consiguiente dificultad en obtener testigos y reconstruir la prueba. En la situación de autos no se le impone tal carga al sistema. Lo único que ocurre es que pueden anularse ciertas sentencias, aunque no la impuesta por el delito mayor. No hay

que celebrar nuevos juicios. Debe señalarse también, independientemente del número de reos que pudiesen quedar afectados, que a partir de lo dispuesto en el Art. 2 de la Ley Núm. 295 de 10 de abril de 1946, 34 L.P.R.A. sec. 1025, la naturaleza concurrente o consecutiva de las sentencias no afecta necesariamente en este género de casos el tiempo de reclusión. Bajo cualquiera de las circunstancias la Junta de Libertad Bajo Palabra adquiere jurisdicción cuando el reo cumple un período de prisión igual al mínimo más largo. *Oliveras Sepúlveda* v. *Jefe Penitenciaría*, 91 D.P.R. 604, 607, n. 3 (1964). Conforme a *Meléndez Cartagena*, la sentencia que queda en pie es la más grave, por lo que su aplicación retroactiva no altera el momento en que la referida Junta adquiere jurisdicción ni la fecha de excarcelación del convicto según los reglamentos aplicables.

Confirmaría la resolución recurrida.

—O—

Opinión del Juez Asociado Señor Díaz Cruz a la que se unen los Jueces Asociados Señores Rigau, Martín y Negrón García.

San Juan, Puerto Rico, a 27 de diciembre de 1978

El acusado debía extinguir una sentencia de 8 a 12 años de reclusión, de términos consecutivos en los cargos de transportación, ocultación y traspaso, pero concurrentes con la condena por posesión. Dicha sentencia fue confirmada en apelación por este Tribunal el 4 de abril de 1972. Ahora hemos de atender a una moción sobre nulidad de sentencia promovida por el convicto y en la que reclama para sí el beneficio de aplicación retroactiva de la decisión en *Pueblo* v. *Meléndez Cartagena*, 106 D.P.R. 338 (1977), en la cual percibimos en el Art. 63 del Código Penal (33 L.P.R.A. sec. 3321) un contenido dinámico que se activa al considerar la pluralidad de actos delictivos consumados "con tan estrecho ligamen causal

entre cada estadio que el de rango mayor absorbe las sanciones correspondientes a los otros."

El vasto alcance que la opinión del Juez Presidente propone para la nueva regla de retroactividad en el procedimiento criminal me obliga a disentir.

En *Rivera Escuté* v. *Jefe Penitenciaría*, 92 D.P.R. 765, 782 y ss. (1965), siguiendo la jurisprudencia del Tribunal Supremo de los Estados Unidos([1]) adoptamos la norma de que las decisiones de este Tribunal favorables al apelante tendrán efecto retroactivo y afectarán sentencias finales y firmes en casos anteriores similares, únicamente cuando conciernan a la integridad misma del proceso judicial, como es el caso cuando la nueva regla proyecte grave duda sobre el hecho de culpabilidad; o cuestione la imparcialidad del juicio, o el método seguido para adjudicación de los hechos determinantes de culpabilidad. *Rivera Escuté*, pág. 785. Podría sintetizarse la norma como impartiendo retroactividad a aquellas decisiones que mejoran la corrección y confiabilidad del procedimiento para determinar los hechos en el juicio. Esa es la regla no abandonada por el Supremo nacional en *Coin & Currency*, (escolio 1, supra) sino distinguida, adicionando la conducta inmune al castigo por privilegio constitucional, a la conocida razón de que la inaplicación de las nuevas reglas en los anteriores juicios conlleve altas probabilidades de que hombres inocentes hayan sido injustamente sentenciados. El Tribunal Supremo de Estados Unidos ha sido consistente en esta doctrina en ánimo de proteger de erosión el sistema de justicia criminal. El 17 de junio de 1977 se expresó así: "Jamás nos hemos desviado de la regla expuesta en *Ivan V* [v. *City of New York*, 407 U.S. 203] al efecto de que 'allí donde el *mayor* propósito de la nueva doctrina constitucional es superar un

---

([1]) *Linkletter* v. *Walker*, 381 U.S. 618 (1965); *Chicot County Drainage Dist.* v. *Baxter State Bank*, 308 U.S. 371; también *In re López*, 42 Cal. Reptr. 188, 398 P.2d 280; *United States* v. *U.S. Coin & Currency*, 401 U.S. 715, 724 (1970).

aspecto del juicio criminal que *substancialmente* menoscaba su función descubridora de la verdad y de tal modo levanta *serias* cuestiones relativas a la corrección de los veredictos en juicios pasados, la nueva regla tendrá un completo efecto retroactivo.' " *Hankerson* v. *North Carolina,* 432 U.S. 233, 243 (1977).

Nuestra decisión en *Pueblo* v. *Meléndez Cartagena,* supra, proscribiendo las condenas separadas en los delitos de poseer, transportar y vender drogas y confirmando la pena por la modalidad más grave sin anular las convicciones, no establece norma que afecte la "integridad del proceso judicial" en los extremos que dejamos expuestos. Su aplicación a casos ya terminados es arbitraria intervención con el criterio del juez sentenciador que oyó la prueba y sólo impulsado por la intensidad del agravio a la sociedad se salió del automatismo de la sentencia concurrente y optó por la rara alternativa en nuestros jueces de unas penas consecutivas.

Si el recluso es acreedor a una sustancial reducción en su término de reclusión, tiene el remedio de libertad bajo palabra provisto por Ley Núm. 295 de 10 de abril de 1946 (34 L.P.R.A. sec. 1025) que en su Art. 2 ordena que "una vez la persona haya cumplido el *término mínimo* fijado por el tribunal sentenciador para el delito cometido, quedará bajo la jurisdicción de la Junta de Libertad Bajo Palabra, la cual podrá concederle su libertad condicional cuando tenga la razonable convicción de que en dicha persona *se ha iniciado el cambio favorable* que se desea . . . ." *Oliveras Sepúlveda* v. *Jefe Penitenciaría,* 91 D.P.R. 604 (1964).

La imposición excepcional de penas consecutivas es vivo indicio de que si el juez sentenciador estuviese obligado en aquella época por *Meléndez Cartagena,* supra, no se hubiese limitado al mínimo de ocho años,(2) ajustando el período de

---

(2) La anterior Ley de Narcóticos bajo la cual se juzgó al acusado sancionaba la transferencia o recibo de heroína con reclusión de 5 a 20 años. (24 L.P.R.A. sec. 974dd.)

reclusión que la prueba y su consciencia le dictaban. La sentencia es el resultado de un proceso que hizo justicia a la sociedad y al acusado, que mereció nuestra confirmación en grado apelativo y debe, por tanto, respetarse.

El impacto que sobre la administración de justicia pueda tener la aplicación retroactiva de una nueva regla es preocupación ineludible de este Tribunal. *Hankerson*, supra, a la pág. 242. Este Tribunal no puede excarcelar mediante la propuesta retroactividad un número indeterminado de convictos. Careciendo de una data clara en cuanto al impacto de esta decisión poniendo en la calle, no a inocentes sino a convictos, se está actuando a ciegas. Equivale a una fuga masiva autorizada si lo vemos en términos de la epidemia actual de fugas. Se está fomentando una operación indiscriminada de "vaciar cárceles", creando un riesgo más de seguridad porque no sabemos cuántos convictos endurecidos (los que reciben sentencias consecutivas), van a caer otra vez sobre la sociedad sin cumplir el castigo que le impuso el juez después de un proceso limpio, sin tan siquiera haber cualificado por su conducta, para una libertad bajo palabra.

Expediría el auto de *certiorari* y anularía la resolución recurrida.

