Versión para imprimir



EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Pueblo de Puerto Rico<br><br>Recurrido<br><br>v.<br><br>Ángel Santos Santos<br><br>Peticionario | Certiorari<br><br>2012 TSPR 95<br><br>185 DPR ____ |

Número del Caso: CC-2010-98

Fecha: 31 de mayo de 2012

Tribunal de Apelaciones:

> Región Judicial de Bayamón

Abogado de la Parte Peticionaria:

> Lcdo. Elmer A. Rodríguez Berríos
> Sociedad Para Asistencia Legal
> División de Apelaciones

Oficina del Procurador General:

> Lcda. Irene Zoroeta Kodesh
> Procuradora General
>
> Lcda. Zaira Girón Anadón
> Subprocuradora General

Materia: Derecho Constitucional – Derecho de Confrontación; doctrina de error constitucional no perjudicial.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| El Pueblo de Puerto Rico<br><br>Recurrido<br><br>v.<br><br>Ángel Santos Santos<br><br>Peticionario | CC-2011-0098 |

Opinión del Tribunal emitida por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 31 de mayo de 2012

Nos corresponde evaluar nuevamente el alcance del derecho de todo acusado criminal a confrontar a los testigos que declaran en su contra, recogido en la Enmienda Sexta de la Constitución de los Estados Unidos y en la Sección 11 de la Carta de Derechos de la Constitución del Estado Libre Asociado de Puerto Rico. Específicamente, debemos resolver, a raíz de la normativa establecida por la Corte Suprema de los Estados Unidos en el paradigmático caso *Crawford v. Washington*, 541 U.S. 36 (2004), y su progenie,[1] así como por lo resuelto por este Tribunal en *Pueblo v. Guerrido López*, 179 D.P.R. 950 (2010), si para satisfacer las exigencias impuestas por la cláusula de confrontación es suficiente que el acusado tenga oportunidad de contrainterrogar en corte a un perito que

---

[1] *Véanse, e.g., Bullcoming v. New Mexico*, 131 S.Ct. 2705 (2011); *Michigan v. Bryant*, 131 S.Ct. 1143 (2011); *Meléndez Díaz v. Massachusetts*, 129 S.Ct. 2527 (2009); *Davis v. Washington*, 547 U.S. 813 (2006).

testifica en sustitución del químico que preparó el informe de análisis que se admite como evidencia en su contra.

De contestar en la negativa esta interrogante, debemos analizar, además, si tal violación representa un error estructural que acarrea la revocación automática de la sentencia condenatoria emitida o si, en cambio, constituye un error sujeto a la doctrina de error constitucional no perjudicial.

I

El señor Ángel Santos Santos fue acusado de violar el artículo 403(b) de la Ley de Sustancias Controladas, el cual tipifica como delito el uso de un medio de comunicación para cometer cualquier delito bajo dicha ley. El juicio contra el señor Santos Santos y el otro coacusado se celebró el 7 de enero de 2010. La prueba de cargo consistió en el testimonio del agente Arnaldo Rosario Rosario, quien intervino con los acusados el

día de los hechos y efectuó una prueba de campo para determinar si los materiales confiscados eran sustancias controladas. Se presentó, además, el testimonio de la supervisora de la sección de sustancias controladas del Instituto de Ciencias Forenses, la química Zair Díaz Pérez, quien testificó en sustitución del químico Alexis Soto Zeno. El informe de análisis fue realizado por el señor Soto Zeno, pero éste no compareció a corte.

En el juicio se presentó prueba documental que incluyó la prueba de campo realizada por el agente Rosario el 4 de septiembre de 2009. También se admitió en evidencia el

"Certificado de Análisis Químico Forense" realizado por el señor Soto Zeno el 10 de diciembre de 2009. Además, se sometió en evidencia un radio *walkie-talkie* y el material que se ocupó durante la intervención policial.

Según se desprende de la transcripción narrativa de la prueba presentada ante el Tribunal de Primera Instancia, el agente Rosario labora en la División de Drogas de Vega Baja. Como parte de sus funciones, el 4 de septiembre de 2009 se le asignó investigar un punto de compra y venta de sustancias controladas. El agente Rosario testificó que tenía conocimiento sobre el lugar donde operaba el punto de drogas y que llegó allí como a las 10:10 a.m. acompañado por dos (2) agentes de la Policía. Declaró que existía una distancia de doscientos cincuenta (250) a trescientos (300) pies entre el lugar donde estacionó el vehículo y el punto de drogas y que no tardó más de un minuto en llegar al lugar de la intervención.

Al aproximarse al punto de drogas, el agente Rosario observó a dos (2) individuos desde siete (7) a ocho (8) pies de distancia. Indicó que un individuo de tez trigueña tenía una bolsa plástica con varias envolturas color rosa que parecían ser heroína, varias bolsas con cocaína y un billete de veinte (20) en la boca. El otro sujeto, de tez blanca, portaba un radio *walkie-talkie* color negro en su mano derecha.

El agente Rosario manifestó que escuchó decir "por ahí vienen los perros", pero no pudo identificar quién dijo la frase ni a quién fue dirigida. Declaró que se identificó como

policía y que ocupó el material delictivo y el dinero. Luego de arrestar y registrar a los dos (2) sospechosos, el agente Rosario los transportó a la División de Drogas, donde realizó una prueba de campo sobre el material ocupado, la cual arrojó un resultado positivo a heroína y cocaína. El agente Rosario se dirigió entonces al Instituto de Ciencias Forenses, el 9 de septiembre de 2009, con el propósito de entregar el material ocupado para que se realizara el análisis químico.

Por otro lado, la perita química Díaz Pérez declaró que era supervisora del químico Soto Zeno, y atestiguó en torno al procedimiento estándar que se utiliza para llevar a cabo análisis de detección de sustancias controladas. En varias ocasiones, la defensa objetó la admisibilidad de su testimonio bajo el fundamento de que ésta no fue la persona que realizó el análisis químico ni preparó el certificado de análisis químico del material ocupado.

Según el testimonio vertido en juicio, la perita Díaz Pérez lleva veinticinco (25) años trabajando en el Instituto de Ciencias Forenses y desde hacía siete (7) meses supervisaba la sección en la que se analizan los casos de drogas, especialmente los relacionados con cocaína, heroína y marihuana. La perita Díaz Pérez ha efectuado miles de análisis químicos y ha comparecido como testigo en más de cincuenta (50) casos de drogas.

Durante el juicio, manifestó que, como parte de la preparación del Instituto, los analistas reciben un adiestramiento de tres (3) a cuatro (4) meses de duración relacionado con diferentes clases de drogas y con la

instrumentación. Además, indicó que el químico Soto Zeno trabaja bajo su supervisión y que lo conoce personalmente. También explicó que existe un procedimiento uniforme escrito que utilizan todos los analistas y que están obligados a seguir en los casos de drogas.

Sobre el análisis realizado por Soto Zeno, la perita declaró que el químico siguió el protocolo establecido y que se efectuó correctamente. Durante el juicio, reconoció la firma del señor Soto Zeno a los fines de autenticar el certificado de análisis químico. Explicó que autenticó la firma porque revisaba el treinta por ciento (30%) de los casos atendidos por sus subalternos, los cuales incluían los análisis realizados por dicho empleado. Admitió que no verificó mediante pruebas científicas el análisis químico producido en este caso, pero expresó que examinó los resultados y el expediente el mismo día del juicio, cuando la llamaron al Instituto de Ciencias Forenses en horas de la tarde. Testificó que el material ocupado por la Policía dio positivo a heroína 0.47 gramos y a cocaína 0.57 gramos, que el análisis se efectuó siguiendo el procedimiento de pruebas de cristales y que luego se realizó la instrumentación de las muestras con un resultado positivo a heroína y cocaína.

A petición del Ministerio Público, el Tribunal de Primera Instancia admitió en evidencia el certificado de análisis químico. Posteriormente, luego de examinar la totalidad de la prueba presentada, dicho tribunal declaró culpable al señor Santos Santos por violación al artículo 403(b) de la Ley de Sustancias Controladas. Concluyó que el

señor Santos Santos utilizó un radio *walkie-talkie* para facilitar la comisión de un delito según la ley aplicable. Además, resolvió que el testimonio de la perita Díaz Pérez era admisible tras concluir que existía un protocolo y un procedimiento estándar aceptado por la comunidad científica internacional y que el análisis químico realizado en este caso fue conforme a tal procedimiento.

Inconforme con dicho dictamen, el señor Santos acudió oportunamente al Tribunal de Apelaciones mediante recurso de apelación. Como primer señalamiento de error, alegó que el Tribunal de Primera Instancia erró al admitir en evidencia el informe del análisis químico. Señaló que se violó su derecho a confrontación ya que no tuvo oportunidad de confrontar y contrainterrogar al químico que preparó el informe. Además, sostuvo que no se probó su culpabilidad más allá de duda razonable, por lo que procedía revocar la sentencia emitida. Por su parte, la Procuradora General presentó una oposición al recurso. En ésta sostuvo que la admisión del certificado de análisis químico constituyó un error no perjudicial que no acarreaba la revocación de la sentencia. Arguyó, además, que el Ministerio Público presentó prueba independiente y suficiente para probar la culpabilidad del señor Santos más allá de toda duda razonable.

Luego de analizar la jurisprudencia interpretativa sobre el derecho a confrontación, el Tribunal de Apelaciones resolvió que no erró el Tribunal de Primera Instancia al admitir en evidencia el certificado de análisis químico y el testimonio de la perita sustituta Díaz Pérez. Concluyó que

"ni la Constitución del Estado Libre Asociado de Puerto Rico, en su Art. II, Sección 11, ni la Constitución de los Estados Unidos, en su Sexta Enmienda, ni el desarrollo jurisprudencial del caso *Crawford* y su progenie en los Estados Unidos, ni el caso *Pueblo v. Guerrido*, en Puerto Rico, requieren, como única alternativa para lograr la admisibilidad del Informe de análisis químico, que sea el químico que realizó el análisis la única persona que puede declarar en juicio". *El Pueblo de Puerto Rico v. Ángel Santos Santos*, KLAN201000476, en la pág. 27.

Aún inconforme, el señor Santos Santos presentó oportunamente ante este Tribunal un recurso de *certiorari* mediante el cual nos solicita que revoquemos la sentencia confirmatoria emitida por el foro apelativo intermedio. Reitera esencialmente los mismos señalamientos de error que ante el Tribunal de Apelaciones; es decir, (1) que erró el Tribunal de Primera Instancia al admitir en evidencia el análisis químico que se realizó a la sustancia ocupada sin que tuviera la oportunidad de contrainterrogar al funcionario profesional que preparó dicho análisis y redactó el informe aludido, y (2) que no se probó su culpabilidad más allá de duda razonable. El 27 de mayo de 2011 expedimos el recurso. El Ministerio Público presentó su oposición el 28 de septiembre de 2011. Con el beneficio de la comparecencia de ambas partes, procedemos a resolver.

**II**

**A**

*El derecho constitucional a la confrontación*

La Sección 11 del Artículo II de la Constitución del Estado Libre Asociado dispone que "[e]n todos los procesos criminales, el acusado disfrutará del derecho a . . . carearse con los testigos de cargo". Secc. 11, Art. II, Const. PR. De igual manera, la Enmienda Sexta de la Constitución de Estados Unidos establece que todo acusado en un proceso criminal disfrutará del derecho a confrontar a los testigos que se presenten en su contra.[2] Ambas disposiciones recogen lo que la jurisprudencia ha venido a conocer como la *cláusula de confrontación*.

El derecho a la confrontación tiene tres aspectos fundamentales. En primer lugar, todo acusado tiene derecho al careo o confrontación *cara a cara* con los testigos adversos; en segundo lugar, tiene  derecho a contrainterrogar a los testigos adversos; y, por último, tiene derecho a que se excluya cierta prueba de referencia que pretenda utilizar el Ministerio Público como prueba de cargo. *Véase* Ernesto L. Chiesa Aponte, *Derecho Procesal Penal de Puerto Rico y Estados Unidos* 569 (1991).

**La revolución de *Crawford v. Washington***

El derecho a la confrontación se vio fortalecido significativamente en 2004, cuando la Corte Suprema federal resolvió *Crawford v. Washington*, 541 U.S. 36 (2004). En éste

---

[2] "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." Enmda VI, Const. EE.UU.

el Tribunal revocó expresamente lo resuelto aproximadamente un cuarto de siglo antes en *Ohio v. Roberts*, 448 U.S. 56 (1980). En *Roberts*, el Tribunal había concluido que la cláusula de confrontación no impedía que se admitiera en evidencia contra un acusado una declaración testimonial de un testigo ausente, siempre que se hiciera una determinación judicial de que la declaración contenía suficientes indicios de confiabilidad. Es decir, que se encontrara bajo una excepción firmemente arraigada o que gozara de garantías particularizadas de confiabilidad.

Tras rechazar las nociones de confiabilidad de *Roberts*, la Corte aclaró en *Crawford,* que la cláusula de confrontación de la Enmienda Sexta de la Constitución estadounidense sólo permite la admisión en evidencia de una declaración testimonial hecha contra un acusado fuera de corte si (1) el declarante no está disponible para comparecer al juicio y (2) el acusado tuvo la oportunidad de contrainterrogar al declarante en el momento en que se hizo la declaración. De no satisfacerse estos dos (2) requisitos, la declaración sería prueba de referencia inadmisible contra el acusado, independientemente de que satisfaga una excepción a la regla de exclusión de prueba de referencia.[3]

_____

[3] Los hechos del caso son los siguientes: Michael Crawford apuñaló a un hombre que, según él, intentó agredir sexualmente a su esposa. Durante el juicio, el Ministerio Público presentó al Jurado la grabación de una declaración de la esposa del acusado mediante la cual ésta describía lo sucedido a la Policía. La declaración contradecía la versión de Crawford sobre que había apuñalado al hombre en defensa de su esposa. El Jurado lo halló culpable de agresión. La corte suprema del estado de Washington confirmó la determinación basándose en *Ohio v. Roberts*, 448 U.S. 56 (1980), decisión

De esta manera, *Crawford* aclara que, más que garantizar la confiabilidad de la evidencia presentada contra un acusado, la cláusula de confrontación exige que dicha confiabilidad sea evaluada mediante un mecanismo en particular: el contrainterrogatorio.[4] Se trata, pues, de una garantía procesal a favor del acusado que no es susceptible de evasión a conveniencia del Estado.

Ahora bien, conforme a lo dispuesto en *Crawford*, la cláusula de confrontación sólo se activa en relación con declaraciones *testimoniales*. Así lo aclara la Corte Suprema federal al definir el término *testigo*s de la Enmienda Sexta:

> The text of the Confrontation Clause . . . applies to "witnesses" against the accused—in other words, those who "bear testimony". . . . An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark does not. The constitutional text, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement.

*Crawford*, 541 U.S. en la pág. 51 (citas omitidas y énfasis suplido); *Guerrido López*, 179 D.P.R. en la pág. 968.

De esta forma, *Crawford* no sólo define lo que es un testigo para efectos de la cláusula de confrontación, sino que establece que esta definición aplica tanto para testimonios hechos en corte como para declaraciones

_____

que permitía la admisión contra un acusado de testimonio realizado fuera de juicio siempre que el testimonio fuera confiable.

[4] "To be sure, the [Confrontation] Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantial guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. . . ." *Crawford v. Washington*, 541 U.S. 36, 61 (2004).

realizadas fuera del tribunal (*out-of-court statements*). Es importante señalar, no obstante, que *Crawford* no prohíbe la admisión de declaraciones hechas fuera del tribunal si el propósito de la admisión no es probar la veracidad de lo aseverado. Tampoco prohíbe la admisión de una declaración anterior que sería admisible como excepción a la regla de exclusión de prueba de referencia, si el declarante se encuentra disponible para ser contrainterrogado durante la vista. *Guerrido López*, 179 D.P.R. en la pág. 968.

Por último, en torno a la definición de lo que constituye una declaración testimonial conforme a *Crawford*, la Corte Suprema federal rechazó expresamente dar una explicación exhaustiva del término. Sin embargo, ofreció ejemplos de declaraciones que debían tomarse como testimoniales: testimonio vertido durante juicio, declaraciones juradas, interrogatorios bajo custodia, testimonios anteriores en los cuales el acusado no haya tenido oportunidad de contrainterrogar, declaraciones vertidas antes del juicio en circunstancias que el declarante razonablemente pudiera esperar que fueran usadas por el Ministerio Público, declaraciones extrajudiciales tales como affidávits, testimonios anteriores y declaraciones hechas en circunstancias que razonablemente pudieran llevar a un testigo objetivo a creer que tal declaración pudiera estar disponible para utilizarse en un juicio posterior. *Crawford*, 541 U.S. en las págs. 51-52; *Guerrido López*, 179 D.P.R. en las págs. 968-69.

Recientemente, en *Michigan v. Bryant*, 131 S.Ct. 1143 (2011), la Corte Suprema retomó este tema y resolvió que para determinar si una declaración es testimonial, hay que evaluar si tiene como propósito primario crear un sustituto extrajudicial de lo que sería testimonio en corte. *Id*. en la pág. 1155. Cuando el propósito primario de la declaración no es crear un récord para juicio, la admisibilidad de la declaración dependerá de las reglas de evidencia estatales y federales, no de la cláusula de confrontación. *Id.*

**La aplicación de *Crawford* al informe químico forense: *Meléndez Díaz v. Massachusetts***

Apenas cinco (5) años después de resolverse *Crawford*, la Corte Suprema resolvió *Meléndez Díaz v. Massachusetts*, 129 S.Ct. 2527 (2009). En dicho caso, el Tribunal concluyó que el informe de laboratorio químico forense que se prepara para presentarse en juicio como prueba sustantiva contra un acusado, es una declaración testimonial sujeta a las exigencias de la cláusula de confrontación según expuestas en *Crawford*. Por ello, no era suficiente para soslayar la exigencia constitucional que el informe fuera certificado ante notario público, como permitía la ley del estado de Massachusetts como excepción a la regla general de exclusión de prueba de referencia contra un acusado.[5]

---

[5] Los hechos del caso son los siguientes: Luis Meléndez Díaz fue arrestado mientras realizaba una venta de cocaína en un estacionamiento en Massachusetts. En el juicio en su contra se admitieron bolsas de cocaína que, según la acusación, fueron distribuidas por Meléndez Díaz, así como unos certificados de análisis de droga preparados por un técnico de laboratorio que analizó las sustancias y las identificó como cocaína. Un Jurado condenó a Meléndez Díaz de distribuir y traficar cocaína en violación a la ley de Massachusetts.

La Corte sostuvo que el informe químico es testimonial porque "testifica" precisamente lo que testificaría el químico si compareciera al juicio. Es decir, el informe es el equivalente práctico del testimonio en corte que vertería un testigo en el interrogatorio directo, sin permitir al acusado confrontar adecuadamente a su acusador.

La Corte rechazó el argumento de que el informe del químico no era un testigo acusador, aclarando que para efectos de la cláusula de confrontación, sólo existen dos (2) tipos de testigos: aquéllos en contra del acusado y aquéllos a su favor. Por lo tanto, como el analista químico habría sido testigo, ciertamente el informe preparado por él representaba una declaración testimonial contra el acusado pues intentaba probar que el material ocupado y analizado era precisamente la sustancia ilegal cuya posesión se imputaba al acusado. El máximo foro federal descartó, además, que el informe no tuviera carácter testimonial por no tratarse de un testigo que declara sobre un evento pasado, sino de un testigo no típico ni ordinario, que sólo refleja contemporáneamente los análisis que realiza el químico que los prepara. Por último, la Corte Suprema negó también que el informe fuera un testigo no convencional, no sujeto a la cláusula de confrontación, por no tratarse de una declaración que surge de un interrogatorio; se basó en que la

El acusado apeló su condena y alegó que, bajo *Crawford*, el informe del químico era una declaración testimonial, por lo que debía comparecer un químico para ser interrogado. La Corte de Apelaciones de Massachusetts descartó los argumentos de Meléndez Díaz y, en una nota al calce de una opinión que no se publicó, los tildó de inmeritorios. La Corte Suprema de Massachusetts denegó el recurso.

Constitución no exime a los testigos cuyo testimonio sea voluntario de la necesidad de someterse a contrainterrogatorio. *Véase Guerrido López*, 179 D.P.R. en las págs. 976.

Como dijéramos en *Guerrido López*, *Crawford* y su progenie constituyen jurisprudencia normativa para nuestra jurisdicción. *Id.* en la pág. 962. Claro está, las interpretaciones que la Corte Suprema realice sobre la cláusula de confrontación federal, así como de cualquier otro derecho aplicable a nuestra jurisdicción, representan meramente el mínimo obligados a reconocer bajo nuestra propia Constitución, sin impedimento alguno de interpretar más ampliamente derechos cobijados bajo la factura más ancha de nuestra Constitución moderna. *Véanse Pueblo v. Meléndez Rodríguez*, 136 D.P.R. 587 (1994); *Pueblo v. Rivera Colón*, 128 D.P.R. 672 (1991); *Pueblo v. Malavé González*, 120 D.P.R. 470 (1988).

**La aplicación de Meléndez Díaz a nuestra jurisdicción: *Pueblo v. Gerrido López***

En 2010, esta Curia tuvo la oportunidad de atender una controversia que catalogamos como idéntica a la resuelta por la Corte Suprema en *Meléndez Díaz*. En *Pueblo v. Guerrido López*, 179 D.P.R. 950 (2010), concluimos que, conforme a los criterios establecidos en *Meléndez Díaz*, los informes preparados por el Instituto de Ciencias Forenses en las circunstancias de aquel caso eran claramente testimoniales. Además, resolvimos que, dado que el Ministerio Público nunca justificó la no disponibilidad del declarante y el acusado

nunca tuvo la oportunidad de contrainterrogarlo con relación a ese informe, las circunstancias del caso se ajustaban perfectamente a aquéllas consideradas en *Meléndez Díaz*.

Luego de la decisión de *Meléndez Díaz*, jurisdicciones estatales en Estados Unidos, así como tribunales federales inferiores, han interpretado restrictivamente lo allí resuelto. Como discutimos anteriormente, en dicho caso se pretendía admitir en evidencia un informe de laboratorio sólo mediante la certificación de un notario público, por lo que el máximo foro federal no resolvió si violaba la cláusula de confrontación que un perito químico sustituto testificara en corte sobre el informe preparado por otro químico que no estaba disponible para comparecer a juicio. Esto dio paso a que muchas jurisdicciones permitieran esta práctica tras concluir que, de esta forma, al acusado se le garantizaba su derecho a contrainterrogar a los testigos en su contra.

## *Meléndez Díaz* y el testimonio del perito sustituto: *Bullcoming v. New Mexico*

La Corte Suprema federal atendió finalmente esta controversia en *Bullcoming v. New Mexico*, 131 S.Ct. 2705 (2011). Mediante decisión dividida (5-4), la Corte resolvió que el testimonio del perito sustituto viola la cláusula de confrontación de la Enmienda Sexta cuando el informe del químico es admitido en evidencia y el sustituto no observó la preparación del análisis forense ni ofreció su opinión independiente sobre los hallazgos. Según el máximo foro, el informe presentado representaba una declaración testimonial, por lo que el declarante, el analista que realizó el análisis

y redactó el informe, debía comparecer a juicio para que fuera admitido como evidencia. Los mismos cuatro (4) jueces que disintieron en *Meléndez Díaz* concluyeron que no era necesario que testificara únicamente el analista que preparó el informe y mostraron su insatisfacción con el desarrollo jurisprudencial producido tras *Crawford*.

Por su parte, la juez Sotomayor emitió una opinión concurrente importante que enfatiza el alcance restrictivo de la opinión de la Corte. Según ésta, (1) no estaba ante la consideración de la Corte la posible inconstitucionalidad de un informe realizado con fines distintos a ser utilizado en corte contra el acusado; (2) no se trataba de un caso en que el perito sustituto fuera un supervisor, revisor o alguien con alguna conexión personal, aunque limitada, con el análisis científico realizado; ni (3) era un caso en que el Ministerio Público intentaba presentar como evidencia unos resultados generados solamente por máquinas (*machine-generated results*). Por tanto, la constitucionalidad del testimonio pericial sustituto bajo circunstancias como las descritas aún no ha sido adjudicada por la Corte Suprema de los Estados Unidos.

En el caso ante nuestra consideración, el Tribunal de Apelaciones sostuvo la determinación del Tribunal de Primera Instancia que admitió como evidencia sustantiva contra un acusado el informe químico forense realizado por un analista que no es el testigo que comparece a juicio para someterse a contrainterrogatorio por el acusado. Al momento en que el foro apelativo intermedio dictó sentencia, *Bullcoming* no

había sido resuelto aún por la Corte Suprema. Debemos evaluar si procede aplicar la norma de *Bullcoming* o si, por el contrario, existen circunstancias particulares que distinguen a este caso del resuelto por el foro federal. De ser este el caso, debemos evaluar si, aun bajo estas circunstancias distintas, se violó el derecho a la confrontación del peticionario bajo la Enmienda Sexta de la Constitución federal o bajo la Sección 11 del Artículo II de la nuestra.

**B**

Como sabemos, no todo error de admisión o exclusión de evidencia acarrea la revocación de la resolución o sentencia recurrida. El inciso (a) de la Regla 105 de Evidencia, 32 L.P.R.A. Ap. VI R. 105,  establece como norma general que "no se dejará sin efecto una determinación de admisión o exclusión de evidencia ni se revocará por ello sentencia o decisión alguna a menos que: (1) la parte perjudicada con la admisión o exclusión errónea de evidencia hubiere satisfecho los requisitos de objeción, fundamento y oferta de prueba . . . y (2) el Tribunal que considere el señalamiento estime que la evidencia admitida o excluida fue un factor decisivo o sustancial en la sentencia emitida o decisión cuya revocación se solicita". *Id.*

Este segundo requisito toma en consideración el impacto del error cometido sobre el resultado a que llegó el juzgador, pues es posible que se cometa un error de derecho probatorio y que el tribunal evaluador considere que dicho error no tuvo efecto significativo sobre el resultado del caso, por lo que confirme el dictamen a pesar del error. Se

trata de errores judiciales de carácter no perjudicial (*harmless errors*). *Véase Arizona v. Fulminante*, 499 U.S. 279 (1991). En estos casos, el tribunal deberá evaluar si, de no haberse cometido el error, lo más probable es que el resultado hubiera sido el mismo. *Véase* Ernesto L. Chiesa Aponte, *Reglas de Evidencia de Puerto Rico 2009*, 88 (2009). De concluir que sí, procedería confirmar la sentencia condenatoria; de concluir lo contrario, revocarla.

Sin embargo, no todo tipo de error en el proceso judicial está sujeto a la doctrina de error no perjudicial. El error estructural se refiere a un error de tal magnitud que lesiona fatalmente el sistema adversativo o el juicio imparcial. *Id*. Por esta razón, de incurrirse en este tipo de violación, procedería la revocación automática de la sentencia recurrida, independientemente de la abundancia o contundencia del resto de la prueba presentada por el Ministerio Público.

Por su parte, el inciso (b) de la Regla 105 de Evidencia, 32 L.P.R.A. Ap. VI R. 105, añade que "[s]i el error en la admisión o exclusión de evidencia constituye una violación a un derecho constitucional de la persona acusada, el tribunal apelativo sólo confirmará la decisión si está convencido más allá de duda razonable de que, de no haberse cometido el error, el resultado hubiera sido el mismo". *Id.* Este apartado codifica la norma constitucional pautada por la Corte Suprema de Estados Unidos en *Chapman v. California*, 386 U.S. 18 (1967), según la cual, si el error cometido lesiona un derecho constitucional del acusado, no procede declarar

tal error como no perjudicial a menos que el tribunal que aquilata el error esté convencido *más allá de duda razonable* de que*,* de no haberse cometido el error, lo más probable es que se hubiera llegado al mismo fallo o veredicto. E.L. Chiesa Aponte, *Reglas de Evidencia* 88-89. En apelación de una sentencia condenatoria, le corresponde al convicto establecer, a satisfacción del tribunal apelativo, que se cometió un error de rango constitucional, pero le corresponde al Ministerio Público persuadir al foro apelativo más allá de toda duda razonable de que se trata de un error no perjudicial; es decir, que de no haberse cometido el error constitucional, el resultado habría sido el mismo.

En el caso de autos, el peticionario plantea que el Tribunal de Primera Instancia violó su derecho a confrontar a los testigos de cargo. Se trata de un derecho protegido tanto por la Constitución del Estado Libre Asociado como por la de Estados Unidos. Por tanto, de este Tribunal concluir que es meritoria la alegación del señor Santos Santos, procedería entonces analizar si, conforme a los principios esbozados anteriormente, tal violación constitucional constituye un error estructural que acarrea la revocación automática de la sentencia recurrida o si trata de un error susceptible de análisis bajo la doctrina de error constitucional no perjudicial. Veamos.

## III

### A

Evaluada la jurisprudencia normativa sobre la controversia ante nuestra consideración, así como el cuadro

fáctico que se desprende del expediente de autos, especialmente la transcripción narrativa de la prueba presentada en corte, no cabe duda de que al acusado se le violó su derecho a confrontación al no presentar como testigo al analista que preparó el informe, el señor Soto Zeno.

Al señor Santos Santos se le acusa de haber violado el artículo 403 de la Ley de Sustancias Controladas, 24 L.P.R.A. sec. 2403.[6]

---

[6] El inciso (b) del artículo 403 de la Ley de Sustancias Controladas dispone que:

> Será ilegal el que cualquier persona a sabiendas o intencionalmente use cualquier medio de comunicación para cometer o facilitar la comisión de algún acto que constituya delito bajo cualquier disposición de esta Ley. . . . Para los propósitos de este inciso, el término "medio de comunicación" significa cualquier sistema público o privado utilizado para la transmisión de escritos, signos, señales, retratos, sonidos, incluyendo el correo, teléfono, telégrafo, radio y cualquier otro medio de comunicación.

Por su parte, el inciso (a) del artículo en cuestión establece que:

> Será ilegal el que cualquier persona, a sabiendas o intencionalmente:
> (1) que sea persona registrada, distribuya una sustancia controlada de las incluidas en las Clasificaciones I o II en el curso de su legítimo oficio o profesión, salvo de conformidad con la hoja oficial de pedido requerida por [el artículo 307] de esta Ley;
> (2) use en el curso de la fabricación o distribución de una sustancia controlada un número de registro ficticio, revocado, suspendido o emitido a otra persona;
> (3) adquiera u obtenga la posesión de una sustancia controlada por medio de falsa representación, fraude, falsificación, engaño o subterfugio o adquiera u obtenga la posesión de una sustancia controlada, ya sea mediante compra u otro medio, de un fabricante, distribuidor o dispensador que no haya obtenido el correspondiente registro para operar en Puerto Rico;

Cuando a una persona se le imputa la posesión de una sustancia controlada, la prueba de la identidad de la sustancia ocupada es un elemento esencial del delito. Por tanto, el Ministerio Público tiene la obligación ineludible de establecer que la sustancia ocupada es una prohibida y que es efectivamente la sustancia alegada en la acusación. Este hecho puede probarse mediante un análisis químico realizado a la sustancia.

Conforme a lo resuelto en *Meléndez Díaz* y *Guerrido López*, cuando el análisis químico se realiza como parte de un procedimiento criminal con el propósito de utilizarse como prueba en contra del acusado, como sucedió en este caso, se trata de una declaración testimonial que está sujeta a las exigencias de la cláusula de confrontación conforme a *Crawford*. Por ende, en el caso de autos, el Certificado de Análisis Químico Forense admitido en evidencia, donde se concluía que la sustancia evaluada era cocaína y heroína, constituyó una declaración testimonial que requería que el declarante compareciera a juicio para ser contrainterrogado.

_____

(4) suministre información pertinente que sea falsa o fraudulenta u omita información pertinente en cualquier solicitud, informe, récord, o en cualquier otro documento que se requiera llevar o mantener bajo esta Ley; o

(5) haga, distribuya o posea algún punzón, cuño, plancha, piedra u objeto destinado a estampar, imprimir o reproducir la marca de fábrica, el nombre comercial, o cualquier otra marca, impresión o divisa de otro producto o de otra persona, o cualquier objeto parecido a los descritos precedentemente, en una droga, su envase o en la marca, etiqueta o rótulo de la misma convirtiendo dicha droga en una sustancia falsificada.

24 L.P.R.A. sec. 2403.

Ahora bien, para resolver si el testimonio de la perita sustituta es suficiente para satisfacer el derecho de confrontación del acusado, debemos preguntarnos quién es verdaderamente el declarante que testifica en su contra. Como reitera la Corte Suprema en *Bullcoming*, 131 S.Ct. en la pág. 2705, una lectura sensata de *Crawford* y de *Meléndez Díaz* sólo puede conducir a una conclusión: el declarante es la persona que realizó el análisis y preparó el informe que se intenta admitir como evidencia. Este hecho ya había sido reconocido expresamente en la opinión disidente de *Meléndez Díaz* y fue precisamente la razón por la que estos jueces difirieron de la postura mayoritaria. *Meléndez Díaz*, 129 S.Ct. en la pág. 2545.

Además, a pesar de que la controversia atendida por esta Curia en *Guerrido López* era distinta a la del caso de autos, dado que se circunscribía a la naturaleza testimonial del análisis químico, la consecuencia inexpugnable de nuestra determinación nos llevó a concluir desde entonces lo que hoy resolvemos inequívocamente: que "no es admisible como evidencia sustantiva contra un acusado un informe químico cuando **el técnico que preparó dicho informe** no comparece como testigo en el juicio en el momento en que se solicita su admisión y cuando el acusado no tuvo la oportunidad de contrainterrogar al testigo previamente, con relación a ese informe". *Guerrido López*, 179 D.P.R. en la pág. 979.

No es el deber de los tribunales sustraer de la cláusula de confrontación sus valores subyacentes para luego aplicar sus garantías sólo en la medida en que (conforme al criterio

del propio tribunal) se satisfagan esos valores. *Giles v. California*, 554 U.S. 353, 375 (2008). Por tanto, la cláusula constitucional de confrontación no tolera que se dispense de la confrontación sólo porque un tribunal crea que cuestionar a un testigo sobre las declaraciones testimoniales de otro testigo provee una oportunidad suficientemente justa de contrainterrogar. *Bullcoming*, 131 S.Ct. en la pág. 2716.

A modo ilustrativo, en *United States v. González López*, 548 U.S. 140 (2006), una decisión sobre el derecho a asistencia de abogado, también recogido en la Enmienda Sexta, la Corte Suprema sostuvo que a pesar de que el propósito de los derechos recogidos en la Enmienda Sexta es asegurar un juicio justo, ello no implica que los derechos puedan ser menoscabados siempre y cuando el juicio sea, en general, justo. Si una garantía de la Enmienda Sexta se viola, ningún procedimiento sustituto puede curar dicha violación y no se requiere muestra de perjuicio adicional para que la violación se complete. *Id*. en las págs. 145-46. Si la representación por un abogado sustituto no satisface la Enmienda Sexta, tampoco lo hace la oportunidad de contrainterrogar a un testigo sustituto. *Bullcoming*, 131 S.Ct. en la pág. 2716.

La realidad es que el testimonio de la perita Díaz Pérez no podía recoger lo que el analista Soto Zeno sabía ni lo que éste observó sobre los eventos y resultados que él certificó en su informe forense. Tampoco podía el testimonio sustituto acreditar fielmente cualquier error o mentira en que hubiera incurrido el autor del informe. La propia perita admitió que sólo revisa el treinta por ciento (30%) de los análisis

realizados por sus subalternos y que **nunca revisó científicamente los resultados ni participó en la preparación del informe admitido como evidencia contra el acusado**. De hecho, no examinó los resultados ni el expediente hasta el mismo día del juicio, cuando la llamaron al Instituto de Ciencias Forenses en horas de la tarde. Por tanto, no tenía propio y personal conocimiento de lo declarado en corte, por lo que su testimonio en torno a que el análisis que realizó el químico Soto Zeno siguió el protocolo establecido y se efectuó correctamente constituyó prueba de referencia inadmisible cuya admisión violó la Enmienda Sexta de la Constitución de los Estados Unidos y la Sección 11 de la Carta de Derechos de la Constitución de Puerto Rico.

Recordemos que el derecho en cuestión protege no sólo contra testimonio fraudulento, sino contra el incompetente. En *Bullcoming* se enfatizó el hecho de que el Ministerio Público ni siquiera justificó la no disponibilidad del analista, sino que se limitó a decir que el declarante estaba separado de su cargo sin paga (*unpaid leave of absence*), por lo que el acusado no pudo contrainterrogar respecto a este asunto; nunca supo si la separación se debía a posibles irregularidades en análisis previos o a alguna otra falta crasa del analista. Como en aquél caso, admitir el informe forense sólo porque testificó un sustituto abriría la puerta para que el Ministerio Público escogiera acomodaticiamente a qué testigo presentar en corte, menoscabando así el derecho del acusado a impugnar la capacidad y la credibilidad del testigo en su contra.

El Ministerio Público plantea que las circunstancias de este caso son distintas a las de *Bullcoming* debido a que, en aquel caso, el perito sustituto se limitó a leer el informe admitido en evidencia, mientras que en éste la perita Díaz Pérez, como supervisora del analista que realizó el informe, "revisó" los resultados y proveyó "criterio independiente de peritaje" sobre el análisis químico que realizó su subalterno, el señor Soto Zeno. Por tanto, arguye el Estado que se cumplen al menos dos de las circunstancias que la juez Sotomayor menciona en su opinión concurrente como no resueltas por la Corte. No tiene razón el Ministerio Público.

En primer lugar, la perita sustituta admitió que sólo revisa tres (3) de cada diez (10) informes producidos por sus subalternos y que nunca revisó científicamente los resultados producidos en este caso ni supervisó al señor Soto Zeno en la preparación de este informe particular. La "revisión" a la que alude el Ministerio Público se limitó a mirar el expediente luego de que la llamaran en la tarde del mismo día del juicio. Éste no es el tipo de revisión al que hace referencia la opinión concurrente de la juez Sotomayor. Por tanto, poco importa que fuera la supervisora *de jure* del analista original si admitió que no supervisó *de facto* el informe admitido en evidencia.

En segundo lugar, tampoco tiene razón el Ministerio Público al plantear que el informe es admisible porque la perita proveyó un "criterio independiente de peritaje sobre el análisis químico que realizó su subalterno". Aunque la Corte Suprema federal no resolvió hasta qué punto el análisis

independiente de un perito sustituto valida la admisión en evidencia de un informe químico producido por otro analista,[7] lo cierto es que aquí no hubo tal análisis independiente.

El hecho de que la perita testificara que ha laborado por más de veinticinco (25) años en el Instituto de Ciencias Forenses; que desde hace siete (7) meses supervisa la sección en la que se analizan los casos de drogas; que ha testificado en más de cincuenta (50) casos de drogas; que los analistas reciben un adiestramiento de tres (3) a cuatro (4) meses de duración, relacionado con diferentes clases de drogas y con la instrumentación; que el químico Soto Zeno trabaja bajo su supervisión; que lo conoce personalmente; y que existe un procedimiento uniforme escrito que utilizan todos los analistas y que están obligados a seguir en los casos de drogas, no justifica de manera alguna que se admita en evidencia un informe químico en cuya realización no participó de ninguna manera. Que existan esos mecanismos no asegura que el señor Soto Zeno los utilizó o los satisfizo.

Sobre las afirmaciones de la perita en torno a que el material ocupado por la Policía dio positivo a heroína 0.47 gramos y a cocaína 0.57 gramos; que el análisis se efectuó siguiendo el procedimiento de pruebas de cristales y que luego se realizó la instrumentación, el problema constitucional subyacente es que "sus" conclusiones se basan

---

[7] Actualmente se encuentra ante la consideración de la Corte Suprema federal si también viola la Enmienda Sexta el testimonio en corte de un perito sustituto que *sí* presentó un análisis pericial independiente de un análisis forense preparado por otra persona, que *no* fue admitido en evidencia. *Véase Williams v. Illinois*, Docket No. 10-8505 (expedido el 28 de junio de 2011).

totalmente en un informe químico realizado por otra persona; un informe que representa una declaración testimonial que prueba un elemento del delito. Por tanto, no puede decirse que son realmente independientes.

La perita no probó cómo llegó "de forma independiente" a esas conclusiones. El desarrollo jurisprudencial del derecho a confrontación nos convence de que la Enmienda Sexta de la Constitución estadounidense, así como nuestra Constitución, impiden que un informe preparado por otra persona sea admitido en evidencia meramente mediante el testimonio de un perito sustituto, cuando éste utiliza como fuente o base para sus hallazgos, precisamente, la declaración testimonial que se pretende admitir en evidencia. Ni siquiera nos encontramos ante un caso hipotético en que la testigo afirma que si X hubiera sido evaluado, entonces Y sería el resultado. Aquí la testigo afirmó en corte que el informe preparado por Soto Zeno, el cual concluye que la sustancia ocupada y analizada era cocaína y heroína, se hizo correctamente y conforme al procedimiento establecido. Sin embargo, esto no le constaba de propio y personal conocimiento pues no participó en su producción.

Permitir esta práctica sería un subterfugio para soslayar las exigencias claras reiteradas desde *Crawford* en torno al derecho a confrontación. Bastaría con que un testigo sustituto concordara constantemente con el informe preparado por otro y esbozara cómo llegó "independientemente" al mismo resultado para evadir el imperativo constitucional. El problema se agudizaría cuando el sustituto fuera un

supervisor pues el incentivo para coincidir con el informe será mayor. Después de todo, contradecir un informe preparado por un subalterno sería reflejo no sólo de la incapacidad o incompetencia del supervisado, sino del propio supervisor. La cláusula de confrontación no permite tal burla.

Reafirmamos que los derechos constitucionales no son susceptibles de maleabilidad a conveniencia. La Constitución dispone que todo acusado disfrutará del derecho a carearse con los testigos de cargo. Por tanto, rechazamos el argumento de que aplicar nuestra interpretación de la cláusula de confrontación a evidencia forense impondría una carga indebida al Ministerio Público. Como se señala en *Bullcoming*, muchas jurisdicciones en las que, incluso antes de *Crawford*, se considera parte de la labor del analista forense testificar en juicio sobre sus hallazgos, el "cielo no se ha caído". *Bullcoming*, 132 S.Ct. en la pág. 2719.

Bajo la norma que reconocemos hoy día, el perito sustituto podría realizar una nueva prueba a las sustancias ocupadas y testificar sobre esos hallazgos. Esto fomentaría que las entidades concernientes preservaran mejor la prueba a utilizarse en juicio. Además, nuestra decisión tampoco implica que el Estado venga obligado, necesariamente, a presentar en juicio a toda persona que haya intervenido en la cadena de custodia de la sustancia ocupada, pues siempre tendrá discreción para elegir qué testigos utilizará para probar más convincentemente su caso. Sin embargo, si decide presentar declaraciones testimoniales de alguno de ellos,

tendrá que presentarlo en corte para que el acusado pueda ejercer su derecho constitucional a confrontarlo.

Por último, reiteramos lo expresado por el Juez Presidente en su opinión de conformidad en *Guerrido López* en torno a la aplicación retroactiva de nuevas normas jurisprudenciales a procesos criminales que no hayan advenido fínales y firmes.

Nuestra doctrina de retroactividad o irretroactividad de nuevas normas jurisprudenciales de carácter penal ha estado íntimamente ligada a las normas adoptadas por la Corte Suprema de los Estados Unidos. *Pueblo v. González Cardona*, 153 D.P.R. 765, 771 (2001). Por esta razón, es preciso recordar que antes de 1965, la Corte Suprema federal aplicó los fallos jurisprudenciales a cualquier caso pendiente para revisión judicial de forma retroactiva. C.H. Whitebread & C. Slobogin, *Criminal Procedure: An Analysis of Cases and Concepts* 832 (2000). Sin embargo, como bien se reconoce en *Linkletter v. Walker*, 381 U.S. 618 (1965), la aplicación retroactiva de nuevas normas jurisprudenciales podría tener grandes costos al sistema de justicia criminal. *Guerrido López*, 179 D.P.R. en las págs. 981-82; *Pueblo v. Delgado Rodríguez*, 108 D.P.R. 196, 200 (1978).

Por esta razón, en *Linkletter* y su progenie se establecieron los requisitos para determinar si debía aplicarse retroactivamente una norma jurisprudencial de carácter penal. Estos requisitos los acogimos en *Rivera Escuté v. Jefe de Penitenciaría*, 92 D.P.R. 765 (1965). La Corte Suprema estableció los siguientes criterios: (1) el

propósito que persigue la norma recién establecida; (2) el grado de confianza generado por la antigua norma; y (3) el impacto que tendría en la administración de la justicia la aplicación retroactiva de la nueva norma. *Guerrido López*, 179 D.P.R. en la pág. 982. *Véanse Harkerson v. North Carolina*, 423 U.S. 233 (1977); *Desist v. United States*, 394 U.S. 244 (1969); *Stovall v. Denno*, 388 U.S. 293 (1967).

No obstante, esta normativa de retroactividad fue revisada sustancialmente en *United States v. Johnson*, 457 U.S. 437 (1982), mediante el cual se pautó una distinción entre aquellas convicciones que habían advenido finales y aquéllas que estaban pendientes de revisión directa. En esencia, se determinó que, al amparo de la Enmienda Cuarta de la Constitución de Estados Unidos, la nueva norma aplicaría a todos aquellos casos que no hubieran advenido finales. Posteriormente, esta determinación fue extendida a revisiones directas al amparo de otras cláusulas constitucionales. *Guerrido López*, 179 D.P.R. en la pág. 982.

En *Griffith v. Kentucky*, 479 U.S. 314 (1987), el máximo foro federal hizo extensiva la aplicación retroactiva de todas las normas constitucionales de carácter penal que al momento de su adopción no hubieran advenido finales. De este modo, se adoptó la concepción del juez asociado Harlan según la cual la no aplicación de nuevas normas jurisprudenciales a casos que estén pendientes de revisión directa viola las normas básicas de adjudicación. Esta norma la acogimos en *Pueblo v. González Cardona*, 153 D.P.R. 765. Por otro lado, en *Teague v. Lane*, 489 U.S. 288 (1989), acogiendo las demás

concepciones del juez asociado Harlan al respecto, la Corte Suprema decidió que, como regla general, una norma jurisprudencial no aplicaría retroactivamente si se trataba de un caso de ataque colateral y no directo. *Guerrido López*, 179 D.P.R. en la pág. 983.

Por lo tanto, según los parámetros constitucionales pautados por dicho foro, una nueva norma jurisprudencial de aplicación a los procesos penales deberá tener efecto retroactivo sobre todos aquellos casos que al momento de la adopción de la nueva norma no hayan advenido finales y firmes. *González Cardona*, 153 D.P.R. 765. A su vez, estos parámetros aplican a los casos estatales conforme a *Griffith*. *Guerrido López*, 179 D.P.R. en la pág. 983.

De acuerdo con los principios esbozados anteriormente, al igual que aplicamos retroactivamente la norma de *Meléndez Díaz v. Massachusetts* en *Pueblo v. Guerrido López*, concluimos que la norma establecida por la Corte Suprema de Estados Unidos en *Bullcoming v. New Mexico*, en lo que respecta a la cláusula de confrontación, tiene un efecto retroactivo en nuestra jurisdicción y aplica a todos aquellos casos que al momento de la adopción no hayan advenido finales y firmes. Por tanto, la norma pautada en *Bullcoming* aplica al caso de autos.

**B**

Resta por analizar si el error constitucional cometido por el foro de primera instancia constituye un error estructural que implica la revocación automática de la

sentencia recurrida o si, en cambio, está sujeto a evaluación bajo la doctrina de error no perjudicial.

La Corte Suprema rechazó expresamente resolver este asunto tanto en *Meléndez Díaz,* 129 S.Ct. en la pág. 2542, n. 14, como en *Bullcoming*, 131 S.Ct. en la pág. 2719, n.11, y devolvió ambos casos a sus respectivas jurisdicciones para que las cortes estatales llegaran a sus propias conclusiones, reservándose el derecho de atender el asunto en un proceso apelativo posterior. Este Foro tampoco tuvo que resolver esta incógnita en *Guerrido López*, dado que confirmamos las determinaciones de ambos foros inferiores de denegar la admisión en evidencia del certificado de análisis químico forense.

Antes de *Crawford*, todas las violaciones al derecho de confrontación se consideraban errores judiciales sujetos a la doctrina de error no perjudicial. Al evaluar dichas violaciones en *Delaware v. Van Arsdall*, 475 U.S. 673 (1986), la Corte Suprema recalcó que la clave era si la admisión de la prueba sin la oportunidad de contrainterrogar afectó la confiabilidad del proceso de descubrimiento de la verdad. Además, añadió que otros factores pueden incidir sobre si el error causó el perjuicio necesario para justificar la revocación de la sentencia condenatoria, tales como la importancia del testimonio presentado para el caso del Ministerio Público; si dicho testimonio es acumulativo; la presencia o ausencia de prueba que corrobore o contradiga el testimonio; y, por supuesto, la fortaleza del caso del Ministerio Público en su totalidad.

Aun después de *Crawford*, prácticamente todas las cortes estatales, así como tribunales federales inferiores, han resuelto que una violación al derecho a confrontación bajo *Crawford* no es un error estructural, sino un error judicial sujeto a ser evaluado bajo la doctrina de *Chapman v. California*, 386 U.S. 18, sobre el error constitucional no perjudicial.[8] Aun aquellos tribunales que han revocado una convicción por violaciones al derecho de confrontación bajo la Enmienda Sexta, lo han hecho tras concluir que el resto de la prueba no era suficiente para probar más allá de duda razonable la culpabilidad del acusado, no por resolver que el error cometido fuera de naturaleza estructural.[9]

Coincidimos con la interpretación realizada por estas cortes y resolvemos que la admisión o exclusión errónea de evidencia en violación al derecho a confrontación de la Constitución del Estado Libre Asociado de Puerto Rico, así como la de Estados Unidos, no es un error estructural que acarree la revocación automática de la sentencia recurrida. Por el contrario, dicha sentencia está sujeta a revisión bajo la doctrina de error constitucional no perjudicial de

---

[8] Para un listado exhaustivo de casos en que cortes federales y estatales han declarado no perjudicial una violación a *Crawford*, véase Charles Alan Wright *et al.*, *Crawford: Botts Dots or Needless Detour?*, 30A Fed. Prac. & Proc. Evid. § 637.2, n. 715 (2011). Para efecto ilustrativo sobre el caso de autos, sobresalen *Debrow v. State*, 972 So. 2d 550, 553 (Miss. 2007) (sobre la admisión de resultados de pruebas de alcohol en la sangre cuando el técnico del laboratorio presentado no tenía conocimiento personal de las pruebas) y *State v. Melton*, 625 S.E.2d 609, 612 (2006) (para evadir resolver si informe de laboratorio era testimonial).

[9] *Véase Charles Alan Wright et al.*, *Crawford: Botts Dots or Needless Detour?*, 30A Fed. Prac. & Proc. Evid. § 637.2, n. 716.

*Chapman*, adoptada por este Tribunal en *Pueblo v. Rosaly Soto*, 128 D.P.R. 729, 744-46 (1991), y podrá ser confirmada, si el Ministerio Público logra probar más allá de duda razonable que, de no haber cometido el error, lo más probable es que el resultado hubiera sido el mismo.

No obstante la gravedad de toda violación constitucional, la determinación de que un error es de naturaleza estructural debe reservarse sólo para aquellas violaciones que lesionen fatalmente la naturaleza imparcial de la totalidad del proceso judicial. Ésta ha sido la norma reiterada constantemente tanto en la jurisdicción federal como en la nuestra. Por tanto, si una vez suprimida la prueba admitida erróneamente en este caso (el Certificado de Informe Químico Forense), el resto de la prueba presentada por el Ministerio Público aún logra probar más allá de duda razonable la culpabilidad del señor Santos Santos, no existe impedimento alguno para que se sostenga su convicción.

Por supuesto, nada de lo que resolvemos hoy es óbice para que un tribunal revoque una sentencia condenatoria, basándose en el efecto acumulativo de múltiples errores no perjudiciales que, por sí solos, no justificarían revocar la condena.

Luego de evaluar minuciosamente el expediente de autos, particularmente la transcripción narrativa del testimonio vertido en corte por el agente investigador, el señor Ángel Rosario, concluimos que el Ministerio Público no logró satisfacer el estándar de *Chapman*, el cual le requería probar

más allá de duda razonable que, de no haberse cometido el error constitucional, el resultado habría sido el mismo.

Además del Certificado de Informe Químico Forense, el Ministerio Público presentó como única prueba de cargo el testimonio del señor Rosario. Este testigo fue la persona que intervino con el acusado y que ocupó las sustancias analizadas posteriormente. A través de su testimonio, se admitió en evidencia el instrumento de comunicación utilizado en la transacción (*walkie-talkie*), así como los resultados de la prueba de campo realizada a las sustancias ocupadas, los cuales arrojaron un resultado positivo a heroína y cocaína. Luego de esto, el testigo se refirió a lo relativo a la cadena de custodia del material analizado, sentando las bases para el testimonio posterior de la perita sustituta.

Como indicáramos anteriormente, el peticionario fue acusado de violar el artículo 403 de la Ley de Sustancias Controladas. Uno de los elementos del delito que venía obligado a probar más allá de duda razonable el Ministerio Público era que la sustancia ocupada al señor Santos Santos era precisamente la sustancia controlada cuya posesión se le imputaba. Excluido el Certificado de Informe Químico Forense admitido erróneamente por el Tribunal, el Ministerio Público sólo contaba con el resultado de la prueba de campo como mecanismo para probar este elemento esencial.

Como señala el inciso (h) de la Regla 110 de Evidencia, 32 L.P.R.A. Ap. VI R. 110, cualquier hecho es susceptible de ser probado mediante evidencia directa o circunstancial. Por tanto, el resultado de una prueba de campo podría ser

suficiente, **bajo la totalidad de las circunstancias de cada caso**, para que un juzgador pudiera concluir más allá de duda razonable que la sustancia ocupada a un acusado es lo que se le imputa ser. Sin embargo, en ausencia de prueba científica forense que acredite la identidad de una sustancia ocupada, el Ministerio Público debe demostrar la aceptabilidad y la validez que la comunidad científica le otorga a la prueba de campo realizada. Si la evidencia presentada demuestra que la prueba utilizada es confiable dentro de los parámetros de aceptación de la comunidad científica, tal evidencia, **en unión a la prueba sobre la experiencia del agente y sus cualificaciones respecto a la administración de dicha prueba de campo**, sería suficiente para que un juzgador hallase probado más allá de duda razonable un elemento esencial del delito imputado.

A esta misma conclusión han llegado recientemente otros tribunales estatales.[10] Por ejemplo, en *Commonwealth v. King*, 461 Mass. 354 (2012), la Corte Suprema del estado de Massachusetts tuvo ante su consideración una controversia extremadamente similar a la del caso de autos. En dicho caso,

---

[10] Las jurisdicciones estatales se han dividido en cuanto a la validez del uso de la prueba de campo como mecanismo adecuado para probar más allá de duda razonable la identidad de una sustancia ocupada. Por ejemplo, al igual que en Massachusetts, en *People v. Brightman*, 150 Misc. 2d 60 (1991), los tribunales neoyorquinos resolvieron que el uso de estas pruebas, por sí solo, era insuficiente para tales efectos. A la misma conclusión llegó la Corte Suprema de Wisconsin en *State v. Jackson*, 161 Wis. 2d 527 (1991), tras confirmar la desestimación de una acusación por posesión de cocaína. En cambio, en *Collins v. State*, 278 Ga.App. 103 (2006), la Corte de Apelaciones de Georgia validó su uso para sostener una acusación por venta de cocaína.

la Corte de Apelaciones de Massachusetts resolvió que al acusado le habían violado su derecho a confrontación bajo la Enmienda Sexta al admitir en evidencia en su contra un certificado de informe químico sin la comparecencia en corte del técnico de laboratorio que preparó el certificado. No obstante, el foro apelativo intermedio sostuvo la convicción basándose en que el error no fue perjudicial al considerar el resto de la prueba presentada en su contra, la cual consistía exclusivamente del testimonio del oficial interventor y del resultado de la prueba de campo realizada por éste a la sustancia ocupada, el cual resultó positivo a cocaína. La Corte Suprema de este estado revocó tras concluir que la prueba de campo no fue suficiente para probar la identidad de la sustancia ocupada, pues el agente no testificó en absoluto sobre ningún adiestramiento que hubiera tomado para reconocer la sustancia en cuestión, ni ninguna otra sustancia controlada. Asimismo, el Ministerio Público tampoco presentó prueba alguna en torno a qué tipo de prueba de campo fue utilizada por el agente ni sobre la capacidad de éste para administrarla.

Los cuestionamientos sobre el uso de la prueba de campo para sostener una convicción se basan primordialmente en la poca confiabilidad científica de la cual gozan sus resultados. Esto se debe, particularmente, a la tasa elevada de falsos positivos que puede arrojar este tipo de prueba.[11]

---

[11] Para un análisis exhaustivo sobre el uso de la prueba de campo como método de identificación de una sustancia y sus posibles problemas de aplicación en la esfera penal, véanse John Kelly, *False Positives Equal False Justice* 2-4 (2008);

En el caso ante nos, surge de la transcripción narrativa del testimonio del agente Rosario que, una vez el oficial llevó a cabo la intervención, trasladó al señor Santos Santos a la División de Drogas de Vega Baja. Fue entonces cuando se realizó la prueba de campo a la sustancia ocupada. Págs. 16-17 de la transcripción de la prueba oral. El único testimonio relacionado con la prueba de campo es el siguiente:

> FISCAL: Testigo, usted testificó anteriormente que usted realizó una prueba de campo.
>
> ROSARIO: Correcto.
>
> FISCAL: ¿Cuándo fue que usted realizó la prueba de campo?
>
> ROSARIO: Ese mismo día.
>
> FISCAL: ¿Dónde, si en algún lugar, usted pone el resultado de la prueba de campo?
>
> ROSARIO: Eh, el resultado se marca en la parte posterior, en la parte de abajo, donde dice unas letras o unas palabras. Eh, la sustancia que se ocupa mas [sic] se desglosa la evidencia ocupada, según lo que, eh, lo que se ocupa, verdad.
>
> FISCAL: ¿Algún reparo?
>
> ABOGADA: No.

_____

_Color Test Reagents/Kits for Preliminary Identification of Drugs of Abuse_, NIJ Standard-0604.01, 1 (2000); James M. Shellow, _The End of a Confidence Game_, 24 Champion 22, 23 (2000); S.H. Johns, A.A. Wist & A.R. Najam, _Spot Tests: A Color Chart Reference for Forensic Chemists_, 24 J. Forensic Sci. 631 (1979); R.A. Vivaldi & S.A. Wicks, _The Use of Chemical Spot Tests Kit for the Presumptive Identification of Narcotics and Drugs of Abuse_, 19 J. Forensic Sci. 636 (1974). Por supuesto, el hecho de que la prueba de campo no sea concluyente, por sí sola, para efectos de identificación de una sustancia controlada en la etapa de juicio, no implica que ésta no sea útil para otros fines, tales como la determinación de causa probable para arresto o para acusar. En estas etapas preliminares del procedimiento criminal, el resultado de un análisis químico podría no estar disponible aún y el resultado de la prueba de campo satisfaría el estándar de prueba menos riguroso que se le exige cumplir al Ministerio Público.

FISCAL: ¿No tiene reparo?

ABOGADO: NO.

FISCAL: Su Señoría, sin reparo la defensa, [solicitamos] que se admita en evidencia la prueba de campo.

JUEZ: Se marca como *exhibit* dos del Ministerio Público.

Pág. 18 de la transcripción de la prueba oral.

Del expediente surge que el agente Rosario no testificó sobre el tipo de prueba realizada, ni sobre el proceso seguido. Tampoco habló sobre ninguna experiencia que tuviera en cuanto al uso de este sistema. Sencillamente, se limitó a mencionar el resultado positivo obtenido y relató que guardó la sustancia hasta el día en que la llevó al Instituto de Ciencias Forenses para la realización del análisis químico.

El poco énfasis que prestó el Ministerio Público en detallar este proceso es revelador si se compara con la gran cantidad de preguntas detalladas y complejas que hizo a la perita sustituta para validar el uso del Certificado de Análisis Químico Forense para probar la identidad de la sustancia. Es decir, ante un sistema mucho más confiable científicamente, como lo es el análisis químico realizado por el Instituto de Ciencias Forenses, el Ministerio Público se vio en la necesidad de justificar más el proceso que produjo sus resultados que los de la prueba de campo. Evidentemente, el Ministerio Público nunca tuvo la intención de utilizar la prueba de campo para probar en juicio la identidad de la sustancia ocupada, por lo que el testimonio ofrecido sobre dicha prueba preliminar no cumplió con los requisitos

necesarios para probar más allá de duda razonable que la sustancia ocupada era la sustancia controlada imputada.

Tampoco tiene méritos la alegación del Ministerio Publico en torno a que la defensa validó el resultado de la prueba de campo al no objetar su admisión en evidencia. No se trata de un asunto sobre admisiblidad, sino de insuficiencia de la prueba para probar un elemento del delito. El peso de la prueba para probar más allá de duda razonable cada uno de los elementos del delito imputado recae sobre el Ministerio Público y no puede ser transferido al acusado meramente por el estilo de defensa seleccionado por su representación legal. *Véase*, *e.g.*, *Commonwealth v. Vásquez*, 456 Mass. 350, 355, 367-68 (2010), citando *Commonwealth v. Shea*, 398 Mass. 264, 269 (1986).

Por tanto, no le asiste la razón al Ministerio Público al plantear que, independientemente de la exclusión del Certificado de Análisis Químico Forense, el juzgador habría llegado al mismo resultado.

### IV.

Por los fundamentos expuestos anteriormente, concluimos que el Tribunal de Primera Instancia violó el derecho constitucional a la confrontación del señor Santos Santos al admitir en su contra el Certificado de Informe Químico Forense sin la comparecencia en juicio del analista que lo produjo. Ante las circunstancias particulares de este caso, el Ministerio Público no logró probar más allá de duda razonable la culpabilidad del peticionario, por lo cual

revocamos la sentencia recurrida y decretamos la absolución del señor Santos Santos.

Se dictará sentencia de conformidad.


Anabelle Rodríguez Rodríguez
Juez Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| El Pueblo de Puerto Rico<br><br>Recurrido<br><br>v.<br><br>Ángel Santos Santos<br><br>Peticionario | CC-2011-0098 |

SENTENCIA

San Juan, Puerto Rico, a 31 de mayo de 2012

Por los fundamentos expresados en la Opinión que antecede, los cuales se incorporan íntegramente a la presente, concluimos que el Tribunal de Primera Instancia violó el derecho constitucional a la confrontación del señor Santos Santos al admitir en su contra el Certificado de Informe Químico Forense sin la comparecencia en juicio del analista que lo produjo. Ante las circunstancias particulares de este caso, el Ministerio Público no logró probar más allá de duda razonable la culpabilidad del peticionario, por lo cual revocamos la sentencia recurrida y decretamos la absolución del señor Santos Santos.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. La Jueza Asociada señora Fiol Matta emitió una Opinión de Conformidad. La Jueza Asociada señora Pabón Charneco y los Jueces Asociados señor Rivera García y señor Feliberti Cintrón concurren sin opinión escrita.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico          *Certiorari*

     Recurrido


     v.

                                    CC-2011-98

Ángel Santos Santos

     Peticionario



Opinión de conformidad emitida por la Jueza Asociada señora FIOL MATTA



En San Juan, Puerto Rico, a 31 de mayo de 2012.

Estoy conforme con la Opinión que hoy emite el Tribunal. Sin lugar a dudas, el Ministerio Público venía obligado a sentar como testigo en el juicio contra el señor Ángel Santos Santos al perito químico que llevó a cabo las pruebas científicas para determinar si el material ocupado era, en efecto, una sustancia controlada. No hacerlo constituye una violación al derecho a la confrontación garantizado tanto por la Constitución de los Estados Unidos como por la nuestra. Nuestra

decisión en <u>Pueblo v. Guerrido López</u>[12] y la del Tribunal Supremo federal en <u>Bullcoming v. New Mexico</u>[13] exigen esa conclusión. Es igualmente correcta la conclusión a la que llega la Opinión del Tribunal en cuanto a que la violación al derecho a confrontación es un error constitucional no estructural que no acarrea la revocación automática del fallo condenatorio, sino que exige al Ministerio Público probar "más allá de duda razonable que, de no haberse cometido el error constitucional, el resultado habría sido el mismo".[14] Finalmente, estoy conforme con la decisión del Tribunal de revocar la sentencia condenatoria y absolver al peticionario por insuficiencia de prueba para demostrar su culpabilidad más allá de duda razonable.

Sin embargo, he decidido expresarme por separado para reafirmar lo que entiendo es un deber inescapable del Ministerio Público en casos como estos, en los que uno de los elementos esenciales del delito es de naturaleza técnica o científica; entiéndase, probar que determinado material es, en efecto, una sustancia controlada. Me refiero al deber del Estado de recurrir diligentemente al Instituto de Ciencias Forense para que expertos en la materia lleven a cabo las pruebas científicas necesarias, de manera que se pueda demostrar adecuadamente la naturaleza ilegal de una sustancia. Aunque es cierto, como señala la Opinión, que la Regla 110 de Evidencia permite probar la existencia de cualquier hecho mediante evidencia directa o circunstancial, no deja de ser igualmente cierto que la inhabilidad del Ministerio Público de presentar evidencia científica demostrativa de la ilegalidad de una sustancia genera un problema de suficiencia de prueba para

---

[12] 179 D.P.R. 950 (2010).

[13] 131 S.Ct. 2705 (2011).

[14] Opinión del Tribunal, a la pág. 34.

demostrar culpabilidad de una persona más allá de duda razonable por violaciones a la Ley de Sustancias Controladas. Reafirmamos que es un deber ineludible del Estado recurrir al Instituto de Ciencias Forenses para la realización de las pruebas correspondientes. El que en determinadas circunstancias se pueda demostrar la ilegalidad de una sustancia utilizando otros mecanismos evidenciarios no altera este deber. Tal y como resuelve la Opinión del Tribunal, "los derechos constitucionales no son susceptibles de maleabilidad a conveniencia"[15] ni de "evasión a conveniencia del Estado".[16]

Aclarado lo anterior, reitero mi conformidad con la Opinión del Tribunal, pues fortalece los derechos constitucionales que nos protegen a todos por igual.

Liana Fiol Matta
Jueza Asociada

---

[15] *Id.*

[16] *Id*, a la pág. 10.